[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 29, 2001
THOMAS K. KAHN
CLERK

No. 98-2797

D. C. Docket No. 96-00064-CR-T-23E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS J. CARPA, EMILIO L. IPPOLITO, JACK W. WARREN,
LAURENT J. MOORE, SUSAN MOKDAD, and CHARLES P. DUNNIGAN,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**(October 29, 2001)**

Before EDMONDSON and BIRCH, Circuit Judges, and SHAPIRO\*, District
Judge.

---

\* Honorable Norma L. Shapiro, U.S. District Judge for the Eastern District of Pennsylvania,
sitting by designation.

PER CURIAM:

Defendants appeal their convictions and the district judge's denial of their post-trial motions, including a motion for a new trial because of alleged juror misconduct. This court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

On March 15, 1996, a federal grand jury in the Middle District of Florida returned an 18-count indictment against defendants Emilio Ippolito ("Ippolito"), Susan Mokdad ("Mokdad"), Phillip Marsh ("Marsh"), Douglas Carpa ("Carpa"), Richard Brown ("Brown"), Charles Dunnigan ("Dunnigan"), Jack Warren ("Warren"), and Laurent Moore ("Moore"), for violations of federal law, including attempts to obstruct state and federal court proceedings by threatening jurors. The district judge, on the Government's motion and over defendants' vigorous objection, empaneled an "innominate" jury,[1] and assigned each prospective juror an identification number. The trial lasted from May 28 until August 13, 1997. Brown was acquitted of all charges, Carpa was convicted of all charges, and the remaining defendants were found guilty of some counts and not guilty of others.

I.

---

[1] The district judge preferred to describe the jury as "innominate," not "anonymous," because anonymous connotes a "clandestine, forbidden, and obscure" jury panel. See 6/9/98 Dist. Ct. Op. at 1. The only facts not known to the parties were names, addresses, and exact places of work. See id. We will refer to the jury as innominate as did the district judge.

As a threshold issue, we are concerned about the district judge's investigation of charges of juror misconduct.[2] Our decision turns on few of the many facts adduced, proceedings conducted, and decisions rendered by the district judge throughout the long, difficult trial. Only those facts relevant to this decision

[2] We will not write in detail about all the issues presented. Several issues raised by pro se Defendant Carpa are frivolous: (1) that the district court violated the Inter-American Convention Against Corruption; (2) that the district court erred in excluding the testimony of three "expert" witnesses proffered by Carpa; (3) that the district court erred in refusing to permit Carpa to argue a "justification" defense to the obstruction charges; (4) that the district court erred in failing to recognize the difference between a "pro per" and "pro se" defendant; (5) that the district court erred in failing to act on Carpa's Affidavit of Probable Cause proving Government duplicity;" (6) that the district court was a "military tribunal" instead of an Article III court because the U.S. flag in the courtroom had a gold fringe; (7) that the Government "sandbagged" Carpa at trial; (8) that the district court erred in denying Carpa's "Writ of Error Coram Nobis Where Sentence has not been Served;" (9) that the district court erred in failing to dismiss "the defective indictment;" (10) that the district court erred in failing to admit several "judicial notices" proffered by Carpa; (11) that the district court erred in failing to issue a subpoena sought by Carpa; and (12) that the district court erred in "not assisting Pro Per Defendants to get at the truth."

Defendant Carpa also argues that the district court erred by: (1) empaneling an anonymous jury; (2) failing to dismiss the case for improper venue; (3) denying motions to sever trials with co-defendants; (4) failing to recuse himself from the trial; (5) refusing to admit evidence on jury nullification; (6) limiting cross-examination of government witnesses; (7) failing to unseal the names of the state court jurors with whom the Defendants were accused of tampering; and (8) improperly instructing the jury. He also contends that his conviction violates the 1st Amendment, that 18 U.S.C. § 1503 is unconstitutionally vague, and that prosecutorial misconduct rendered his trial unfair.

Defendant Moore also argues that the trial court erred by denying his request to unseal the names and addresses of the jury in the state court case, failing to sever the trials of the defendants, failing to order a mistrial due to outburst of co-defendants, and permitting a Motion to Enhance Sentence without sufficient notice to Defendant.

Defendant Warren asserts that he was entitled to acquittal on his obstruction of justice charge due to insufficiency of the evidence. Defendant Mokdad claims she was denied her right of self-representation, and joins in a number of points raised by the other defendants.

We conclude that alone or cumulatively, none of the issues listed in this footnote present reversible error.

will be stated below.

During voir dire, the district judge asked each prospective juror whether he or she had been "charged with a crime? And by that I mean something you understood might have resulted in being imprisoned if you were convicted." 6/3/97 Transcript, at 147. Juror 505 responded, "I was stopped last year and charged with driving with a suspended driver's license. It was an unpaid traffic ticket. It has since been resolved, no problem." Id. at 148. The district judge stated, "All right," and proceeded to the next juror. Id. at 148. In fact, during the entire trial, Juror 505 was: (1) on probation following a Florida felony arrest for driving with a suspended license; and (2) required to serve 60 days in jail on weekends. See 3/12/98 Transcript of Proceedings before Circuit Judge Douglas Baird. It is unclear from the record whether any portion of this sentence was actually served during the trial.

The district judge empaneled twelve petit jurors and six alternates; juror 505 was an alternate. At the end of evidence but before deliberation, the district judge excused a juror on a motion by the defense. Juror 505, as first alternate, became a petit juror. Juror 505 subsequently participated in deliberations and remained present during announcement of the verdicts on August 13, 1997.

On October 30, 1997, Robert Gaskin, Esq. ("Gaskin"), of Pinellas County,

4

Florida, contacted Thomas Ostrander, Esq. ("Ostrander"), counsel for Ippolito.

Gaskin advised Ostrander that he had recently taken the sworn deposition of a

party in a marriage dissolution action, and the deponent identified himself as a

member of the petit jury that rendered verdicts in the Ippolito trial. Ostrander

asked Gaskin not to provide him with the juror's identifying information because

of the innominate jury order. See 11/4/97 letter from Ostrander to Judge

Merryday, Docket #776. Gaskin stated that the deponent had admitted to: (1)

being charged and convicted of numerous felonies; and (2) having been on

probation before, during, and after his tenure as a juror in the Ippolito trial.

Ostrander communicated the information he received from Gaskin to the

district judge. See 11/4/97 letter from Ostrander to Judge Merryday, Docket #776.

The district judge asked the Federal Bureau of Investigation ("FBI") to investigate

the facts surrounding Gaskin's allegations, see 6/9/98 Dist. Ct. Op. at 5, and to

identify and investigate the juror and his criminal record.

The FBI assigned Agent Robert Coffin ("Coffin") to investigate; Coffin

deduced that the suspect was Juror 505. Coffin interviewed Juror 505, once in the

presence of Deputy Marshal Billy Walker, and once in the presence of Assistant

United States Attorneys ("AUSAs") Ernest Peluso (the AUSA who prosecuted

defendants) and Robert Monk. Coffin interviewed the Florida probation officer

assigned to Juror 505 once alone, and once in the presence of AUSAs Peluso and Monk. Coffin's interviews of Juror 505 and his probation officer were not in the presence of defense counsel or the district judge.

Defendants moved for a mistrial based on the allegations concerning Juror 505.[3] The district judge held hearings on Juror 505's alleged misconduct on April 6 and 8, 1998 ("the hearings").[4] Evidence was adduced that between 1988 and 1997, Juror 505 was charged with burglary, contributing to the delinquency of a minor, disorderly conduct, grand theft, and driving with a license suspended or revoked. Each charge was either dropped or received an "adjudication withheld," a Florida procedure suspending a jail sentence and placing defendant directly on probation. In 1991, Juror 505 violated probation on the burglary charge, entered a guilty plea, but was still not convicted of a felony. In October, 1996, Juror 505 pled no contest to driving with a license suspended or revoked; his prior traffic infractions upgraded the offense to a third degree felony. Adjudication was withheld, but Juror 505 nevertheless was sentenced to 60 days in custody and 18

---

[3] Defendants did not lack diligence in raising the juror misconduct issue; the innominate jury prevented more timely discovery of the alleged misconduct.

[4] On April 7, counsel for Moore, acting as representative for all defendants, participated in and confirmed the agent's compilation of Juror 505's criminal record. But there were questions about Juror 505's criminal record at the April 8 hearing that neither Agent Coffin, the Government, nor counsel for defendants could answer. Juror 505's presence at the April 6 and 8 hearings would have aided the district judge in clearly understanding the nature of the juror's prior arrests, convictions, and violations of probation.

months probation.

On March 12, 1998, Juror 505 had moved the Florida court to modify his sixty day jail sentence; Judge Douglas Baird originally stated that Juror 505 had to complete his jail sentence, but after learning of Juror 505's service on the jury that convicted some defendants, Judge Baird waived the jail portion of his sentence. See 4/7/98 Order of Honorable Douglas W. Baird.

Juror 505 was not called to testify at the hearings; the only witness heard was Coffin. Coffin testified to Juror 505's criminal record as obtained through: (1) NCIC, the national crime tracking system; (2) interviews with Juror 505; and (3) interviews with Juror 505's probation officer. The NCIC report was incomplete; Coffin was unable to answer difficult questions about Juror 505's record. The District judge acknowledged the "ambiguity as to [Juror 505's] degree of fault [in prior arrests]." See 6/9/98 Dist. Ct. Op. at 15. But at various times during the hearings, the district judge expressed reluctance to order a new trial, presumably because of the length and complexity of the trial. See, e.g., 4/6/98 Hrg. Transcr. at 65, 84; 4/8/98 Hrg. Transcr. at 52.

After the hearings, the district judge, denying defense motions for mistrial, concluded that there was no juror misconduct for lack of evidence that Juror 505 was dishonest or biased. The district judge found that Juror 505: (1) had

7

adjudications withheld on several occasions and served several probationary terms, but had no federal or state felony convictions; (2) never had his civil rights suspended or terminated; (3) had no felony charges pending against him at the time of trial; and (4) satisfied the statutory qualification to sit as a juror under 28 U.S.C. § 1865.

The district judge reasoned that: (1) the mixed verdict was strong evidence that Juror 505 was not biased; (2) retrial would involve large expenditures of time and expense; and (3) Juror 505 did not actively elect to withhold or deflect his criminal record, and if he did, it was to minimize his embarrassment. The district judge implied that any error related to Juror 505 was harmless error. The district judge based his decision on Coffin's hearsay testimony of Juror 505's criminal record and motive.

In April, 1998, Juror 505's identity was revealed by an unknown source; his picture was posted on the internet and his name printed in newspapers. The district judge requested an FBI investigation into the release of Juror 505's identity because it violated court orders restricting the identification of jurors.

II.

Errors during voir dire can so affect a trial that they warrant a new trial. But "[a] litigant is entitled to a fair trial, but not a perfect one." McDonough Power

8

Equip., Inc. v. Greenwood, 464 U.S. 548, 553 (1984). Courts should "ignore errors that do not affect the essential fairness of the trial." Id.; see also 28 U.S.C. § 2111 (harmless error statute). Voir dire examination serves to protect the right to a jury capable and willing to decide the case solely on the evidence before it. See McDonough, 464 U.S. at 554. To invalidate the result of a long and burdensome trial because of a juror's mistaken, though honest, response to a question, "is to insist on something closer to perfection than our judicial system can be expected to give." Id. at 555.

To obtain a new trial for juror misconduct during voir dire, a party must: 1) demonstrate that a juror failed to answer honestly a material question on voir dire, and then 2) show that a correct response would have provided a valid basis for a challenge for cause.[5] See McDonough Power Equip. v. Greenwood, 464 U.S. 548, 556 (1984). McDonough first "requires a determination of whether the juror's answers were honest." BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1473 (11th Cir. 1992). Then, there must be a showing of bias that would disqualify the juror. See id.; United States v. Perkins, 748 F.2d 1519, 1532

---

[5] A pending or final felony conviction is a valid basis for challenge for cause. See 28 U.S.C. § 1865(b)(5) ("a person shall be deemed qualified to serve on a grand or petit jury unless he has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.")

(11th Cir. 1984). Bias may be shown either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed. See BankAtlantic, 955 F.2d at 1473. A juror's dishonesty is a strong indication that of bias. See Perkins, 748 F.2d at 1532. If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error. See McDonough, 464 U.S. at 556.

In BankAtlantic, a civil action, we denied a motion for a new trial because a jury foreman's private reading of a newspaper article about a party did not create a reasonable possibility of prejudice. See BankAtlantic, 955 F.2d at 1472-73. In Perkins, a criminal action, we granted a motion for a new trial because a juror did not correctly answer voir dire questions concerning whether he knew the defendant and whether he had been involved in prior civil and criminal litigation. Perkins, 748 F.2d at 1532. The juror in Perkins also told the jury during deliberations that he knew the defendant and/or had served on a committee with him. Id. at 1533.

Investigation of alleged juror misconduct "is committed to the discretion of the district court and is reviewed only for an abuse of that discretion." United States v. Prosperi, 201 F.3d 1335, 1340 (11th Cir. 2000). A court enjoys "substantial discretion in choosing the investigative procedure to be used in checking for juror misconduct." United States v. Register, 182 F.3d 820, 840 (11th

10

Cir. 1999).  However, the district judge erred in his supervision of the joint FBI-Prosecution private examination of Juror 505.[6]  There seems now to be an insufficiently investigated possibility that Juror 505 was both dishonest and biased during <u>voir</u> <u>dire</u> and throughout the trial.  The district judge had broad discretion to investigate Juror 505, but he never questioned the juror himself and did not establish a sufficient evidentiary record either to determine whether Juror 505 was honest and unprejudiced or to allow us to review the determination.

The conclusions regarding Juror 505 were based primarily on hearsay evidence by Agent Coffin; there remain significant, appeal-determinative issues of: 1) whether juror 505 was influenced from the outset by the possibility of getting his sentence reduced so that his responses to the <u>voir</u> <u>dire</u> questions were deliberately deceptive (in fact, his sixty day custodial sentence was vacated because of his service on the jury); and 2) whether the Government's - the same prosecutor who tried the underlying case - unsupervised <u>ex</u> <u>parte</u> participation in the FBI investigation influenced Juror 505 and/or Agent Coffin.  Defendants may have failed to prove dishonesty and bias because they did not have the opportunity to participate (as did the prosecutors) in the investigation of Juror 505.

The Government argues that actual bias cannot be proved because prejudice

---

[6]  We understand that concerns about the juror's anonymity required special procedures for investigation.  Allowing the pertinent prosecutor to be present, however, without defense counsel, during the investigation raises serious concerns.

could only be shown if Juror 505 held the Government to a lower standard of proof than the law requires; Juror 505 told Coffin that he held the Government to a greater burden of proof than the law requires.[7] The juror's response tends to show bias by the juror because he disregarded court instructions.

On remand and after a proper investigation by the district court, including his own questioning of the juror in camera if necessary (and cross-examination of the juror by defense counsel unless the district court finds such an examination too risky and sets out specific reasons for the finding), the district judge must redetermine whether Juror 505 was ever convicted of or had a charge pending for a felony under 28 U.S.C. § 1865(b)(5), and whether Juror 505's response to the court questioning could have been honestly mistaken or, even if technically accurate, was deliberately intended to deceive to permit him to serve on this jury.

## III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED** except the district court's denial of the motion for a new trial based on juror misconduct is **VACATED** and the case is **REMANDED** for further proceedings on that motion.

---

[7] Coffin testified that Juror 505 stated he held the Government to more than proof beyond a reasonable doubt, i.e., to a 100 percent standard of proof.